# Mineral Railroad & Mining Company, Appellant, *v.* Northumberland County Commissioners (No. 1).

*Taxation—Appeals—Valuation of board of revision—Appointment of expert commissioners.*

1. Although the act allowing an appeal from a tax valuation of the board of revision does not authorize the appointment of expert commissioners to hear testimony, examine the property and report to the court, yet if all of the parties in interest agree, expert commissioners may be appointed, but their report can only be considered as an aid to the court below, and it is only the action of the court upon the report that can be reviewed by the appellate court.

*Taxation—Assessment—Ratio of assessed to actual value.*

2. Where it appears that the assessed value of real estate in a particular county is generally only sixty per cent of its actual value, it is the duty of a court on appeal in making the assessment of a particular property to determine the actual selling value, and fix the assessed value at sixty per cent thereof.

*Taxation—Assessments—Equality.*

3. The purpose of requiring all tax laws to be uniform in their application to the same class of subjects, is to produce equality of taxation, but absolute equality has never been attained, and approximate equality is the best result obtainable under the present system of taxation. Where there is substantial uniformity in the application of tax laws, the mandate of the constitution is not offended against.

4. On an appeal from a tax valuation the court will not take into consideration the fact that the value of a few neighboring tracts of land were assessed below the uniform standard. It can only take into consideration the uniform standard of valuation of general application throughout the county.

5. The courts can only exercise authority in the cases brought before them on appeal, and have no power to revise and equalize assessments generally.

6. Where a landowner has been taxed on the actual acreage which he owned, he cannot complain that a neighbor was taxed for a less number of acres than he owned.

7. The official acre, that is the acre and allowance, as originally authorized in grants from the commonwealth is not the only acre assessable for purposes of taxation. The number of acres recited in the owner's deed is as a rule accepted as the acreage subject to taxation.

8. Uniform increase in the value of real estate throughout the entire

taxing district is not the test of uniform assessment. The assessment is uniform within the meaning of the law if the average ratio of assessed to actual market value is applied in determining the valuation of each separate tract.

9. The foot acre method as a basis for ascertaining the value of coal land for the purpose of taxation, is exceptional, and, in most instances, is not a proper basis to determine actual value. When the parties agree to such a method it may be used, but it is not of general application and when adopted the local conditions must be such as to give the whole coal area a present market value to be ascertained upon some definite fixed basis.

Argued Oct. 6, 1910. Appeal, No. 14, Jan. T., 1910, by plaintiff, from decree of C. P. Northumberland Co., Dec. T., 1907, No. 337, fixing valuation of coal lands in case of Mineral Railroad & Mining Company v. Northumberland County Commissioners. Before FELL, C. J., BROWN, MESTREZAT, POTTER, ELKIN, STEWART and MOSCHZISKER, JJ. Affirmed.

Appeal from valuation of coal lands by the board of revision.

SAVIDGE, P. J., and AUTEN, J., filed the following opinion:

This investigation involves thirty-four so-called coal tax appeals, covering 116 separate properties, running into several million dollars in value.

Valuation for the purpose of taxation being largely a question of comparison it was found necessary to cover the entire anthracite coal field of Northumberland county, the unappealed properties as well as those covered by the appeals.

These appeals are from the commissioners' valuations on assessments of 1907. They first came to the court on February 24, 1908.

Upon consultation with counsel concerned for the various coal property owners, counsel for the commissioners, and the commissioners, it was deemed advisable to appoint what has now become known as the coal tax commission, to take evidence, make personal investigation

upon the ground and report values.  This commission was composed of two experienced expert mining engineers, the one being from Luzerne county and the other from Lackawanna county, and an intelligent business man from Watsontown, Northumberland county, none of whom is in any wise connected with coal interests in Northumberland county.  The personnel of this commission· was entirely acceptable to all parties in interest.

They were instructed to report upon not only those properties where appeals were pending but upon all anthracite coal properties in Northumberland county.

Regardless of what has been the outcome of the inquiry as to the property involved in the appeals, the appointment of a commission has proved to be a wise move, for the reason that their tabulated report has called attention to large inequalities as to a vast number of properties not involved in the appeals.  For instance, there were no appeals by the Philadelphia & Reading Coal & Iron Company covering their properties in Mount Carmel township.  The coal commission has discovered on this block of properties alone an undervaluation of $766,657.

From the exigencies of the case, it has been impossible for the court, with the assistance of the coal commission, to reach such conclusions as would do justice to the various property owners and interests, for the following reasons: In the first place, we were confined in our action to those properties in which appeals were pending.  Secondly, the law does not permit us to increase values beyond those fixed by the county commissioners sitting as a board of revision, except where such valuation was less than that fixed by the assessor, which was the case in a single instance only.

Manifestly, it would be unjust to sustain valuations affecting property of one company fixed far in excess of the values placed upon as good or better neighboring lands over which we had no control, belonging to other companies.  In such cases it was found absolutely necessary to reduce values in order to maintain a semblance

of equality between the taxables. It follows that we could not, with any degree of justice, more than arrive at an approximation of actual values, hence we do not consider that our figures ought to be taken as a criterion for future valuations by assessors or the county commissioners sitting as a board of revision. In many instances we would increase valuations had we the power so to do. In some instances we might still further lower them were it not for the injustice that would be done to individual and small owners.

The coal tax commission, as well as the court, has been greatly hampered for lack of material testimony. In very few cases has there been anything upon which we could calculate values and in no instance has a single witness testified to the probable selling value, at a bona fide sale, of the property under consideration. All parties seem to have fought shy of the one vital question at issue and it has made our task a very discouraging one.

We have done the very best we could under the circumstances and can only express the hope that, if these questions ever again come before us, they may be under such conditions as will afford opportunity to reach conclusions in the light of ample material testimony.

We are filing this opinion to No. 337, December Term, 1907, because that appeal includes the Thomas Hamilton tract, carrying the highest per acre valuation of any anthracite coal land in this county; therefore, it, the best of any, affords opportunity for comparison and illustration.

Before proceeding, however, with matters touching directly this appeal and other appealed lands in the neighborhood of the Hamilton, we call attention, generally, to the conditions in Mount Carmel township, leaving out of question the lands of the Penn Anthracite Coal Company, as to which settlements have recently been reached. The coal lands of that township are in three separate large holdings, namely: those of the Philadelphia & Reading Coal & Iron Company, the Lehigh Valley Coal Com-

pany and the Mineral Railroad & Mining Company. The county commissioners' valuations of the mineral company lands seem to be greatly out of proportion to the valuations of the holdings of the Philadelphia & Reading Coal & Iron Company. As already seen, the coal commission has increased the Philadelphia & Reading's valuations $766,657. This increase being the valuation for assessment purposes and not actual value. We have also called attention to the fact that the court is powerless to increase the county commissioners' valuation for the reason that there are no. appeals by the Reading company.

The coal commission has already largely reduced the valuations of the mineral company lands. Notwithstanding these reductions, however, they still remain far in excess of those of the Philadelphia & Reading Coal & Iron Company. Were we to still further reduce the mineral's valuation, too great injustice would be done to the small property owners of the township. Were we to restore them to the valuation placed upon them by the county commissioners, we would still further increase the already glaring inequality between the reduced coal commission's valuations and the county commissioners' valuations of the Philadelphia & Reading's lands, which cannot be changed. We have, therefore, concluded that the coal tax commission's valuations of the mineral's land ought to stand.

As showing these inequalities we instance a single case, that of the William Sheed tract, which is undeveloped, in the heart of the basin and owned in part by the mineral company and in part by the Reading. The Reading company owns considerable more than two-thirds of this tract upon which the county commissioners placed an assessed valuation of $2,730. The portion owned by the mineral company, being less than one-third of the tract, was valued by the county commissioners at $97,344. The coal commission has reduced the assessed valuation of the mineral tract slightly, bringing it down to $96,600. They have raised the Reading portion of this tract from

$2,730 to $132,339. There still seems to be an inequality as against the mineral company. Other mineral tracts adjoining have been more largely reduced by the coal commission, and many of the Reading tracts have been increased but, as we are powerless to take advantage of the coal commission's increase of the Reading tracts, it would be gross injustice not to accept the coal commission's reduction on the mineral valuation.

As to the Lehigh Valley lands, the large block at the eastern end of the township, consisting of the Miller, Kennedy, Tunis, Smith, Davis, Jordan and others, is practically exhausted of coal and the lands of comparatively little value and we must therefore accept the coal commission's valuation, especially in view of the fact that the adjoining and near by Reading lands enjoy, in comparison, so great an advantage over their neighbors. We find their exhausted condition from the overwhelming testimony in the case. If it were otherwise it is fair to presume there would have been counter testimony on behalf of the county. There is none—absolutely none.

Coming to the block of lands belonging to the Lehigh Valley Company, located partly in Mount Carmel and partly in Coal township, being what are known as the Brown lands, consisting of the White, Reese, Thompson, and other tracts, we have concluded, notwithstanding the reduction made by the coal commission, the county commissioner's valuations ought to be restored. These are virgin lands lying in the center of the basin, with adjoining lands proven and ought to be of as great value per acre as the William Tomlinson, the Sheed, the Wm. Prichard and others of the mineral company, in the same vicinity. The coal commission's valuations of the unworked adjoining mineral lands are still greatly in excess of the county commissioners' valuation of the Brown lands. We, therefore, think that in justice not only to the mineral company, but to the small property owners of the township as well, the county commissioners' valuations must be restored.

Returning to the tracts covered by the appeal No. 337, December Term, 1907, covering all the mineral company's land in Coal township, we have concluded that the coal tax commission's valuations ought to stand. Our reasons are these: With the exception of the Thomas Hamilton all the tracts have been largely mined and many of them practically exhausted. Most of them have been operated almost since the beginning of coal mining in Northumberland county, and as compared with lands to the west of the borough of Shamokin, have not been undervalued by the coal commission.

The Thomas Hamilton, located immediately west of the borough of Shamokin and consisting of 295 acres of mineral only, was valued by the county commissioners far in excess per acre of any other tract of land, large or small, in the entire coal field with the exception of a small acreage in Shamokin borough. Their figure is $2,638 per acre. As reduced by the coal commission, it still stands at the sum of $1,128 per acre, being yet higher than any adjoining tract, or any other tract in the coal field as fixed by either the county commissioners or coal commission, except as above. For this reason we feel that the coal commission's valuation should, in justice to the owners, remain. This tract should pay no more proportionately than adjoiners of equal or greater value. From twenty to twenty-five per cent of the coal has been worked out and there is no breaker or other valuable improvements on the property, the coal being hauled to and prepared at the Cameron breaker, on the adjoining John Brady tract.

The John Carson, the mineral rights of which belong to Langdon & Company, adjoining the Hamilton on the south next to it, carries the highest per acre valuation. This is unappealed from and its valuation cannot be changed. Taking the Hamilton and Carson, and especially the Hamilton, as the standard with which to make comparisons, we necessarily reach the conclusion that the Philadelphia & Reading lands and the lands known as associate lands in Coal and Zerbe townships, between

Shamokin and Treverton, in what is sometimes called the Treverton basin, ought, in several instances to be restored to the valuations fixed upon them by the county commissioners. We believe, with the coal commission, that the Hamilton, is at least, worth and would bring, at a bona fide sale, the estimate fixed upon it by them; therefore, in justice to the mineral company and to the individual taxpayers, many of the properties have been, we feel, estimated too low by the coal commission. The evidence shows that these properties are, most of them, undeveloped, but the coal in them is of the same thickness and of the same general character, and that one property is comparatively of like value with another. We have made full allowance for the coal mined. Also for proximity of the various properties to the outcrop.

The valuation of the William Green, belonging to the Bellas estate, has been greatly reduced by the coal commission and still further reduced by the court, for the reason that the evidence shows that this property has been largely exhausted, the veins very deep, water very troublesome and it is impossible to lease it to the Reading company, which has heretofore worked it, and the chances are that lying as it does, and in its present condition, it would bring very little if put upon the market. Besides the last assessment, a large portion of the surface, that portion situated in the town of Ballaire, has been sold off and, of course, is separately taxed.

We find there has been a mistake in the assessing of the McReynolds tract to the Bellas estate; the evidence shows that it is a double assessment. The John Hoglin and Luke Hoglin call for each other and leave no room for the McReynolds and there is no claim by the Bellas heirs to own this tract of land. We understand that it is not only included in the Reading holdings but is being actually worked by the Reading company as their own property and not under lease from the Bellas estate.

As to the Deering, Kiehl, Watters and Black tracts, we have reduced them below the values fixed by the coal

commission for the reason that they are so small, being only a few acres in extent each, and so isolated from transportation that they could not be mined by independent concerns and therefore would bring very little in the market if put to sale. The same is true of the Benjamin Cumming, Jr., tract.

We conclude that the Helfenstein lands, consisting of 1,960 acres in East Cameron township, most of which are in the coal measures, have not been sufficiently valued, either by the county commissioners or the coal commission. The value put upon them by the county commissioners is $28,800. The actual value placed upon them by the coal commission is $53,800, and it having been agreed by all parties in the beginning, that the coal lands were to be assessed at sixty per cent of their actual value, in conformity to the rule throughout the balance of the county, the coal commission's valuation for taxation would therefore be sixty per cent of this amount, which is $32,280.

(It must be understood that when we are referring to the amounts fixed by the coal tax commission heretofore, the figures have represented sixty per cent of the full valuations fixed by them.)

The assessor of East Cameron township placed a valuation of $248,348 on these lands. Why this great reduction by the county commissioners we do not understand. It is the only instance we have discovered in which the commissioners have cut down the assessors' figures; hence, it is the only instance in which we have the power to increase the valuation beyond that fixed by the county commissioners. We believe this body of lands is of greater value than that fixed by either the county commissioners or the coal commission. There is very little testimony bearing upon values. The map introduced by the defendants shows that approximately five-sixths of the tract is within the coal measure. We do not know how many veins are contained upon it. It would appear however, that a portion at the eastern

end of the tract contains numbers eight and nine, and must, of course, contain the lower veins. It was certainly within the power of the owner to give us some information as to the value of this tract. We are all at sea and do not know why the assessors and the coal tax commission have varied so greatly. However, we have concluded to place a valuation at between $100 and $150 per acre, actual, making the valuation for taxing purposes $150,000.

So far we have not called attention to the appeals covering land in the boroughs of Shamokin and Mount Carmel.

As to the assessments in the borough of Shamokin, the Mineral Railroad & Mining Company, as elsewhere, seems to have gotten the worst of it. The valuation of their mineral rights there, generally, exceed $3,000 per acre, which is far in excess of the county commissioners' valuation of other coal lands anywhere in the county. The average valuation of the Philadelphia & Reading Coal & Iron Company lands in this borough is $500 per acre. These valuations are not appealed from, nor are the valuations of the East End Land & Coal Company or the valuations of the lands of J. Langdon & Company appealed from. These too are very much lower than the mineral valuations. Inasmuch as we are powerless to change these valuations, or those of the Philadelphia & Reading Coal & Iron Company, in the borough, we feel that we are but giving the mineral company a square deal when we reduce their valuations to approximately $1,000 an acre, for their mineral rights.

No appeals having been taken from the revisions made by the county commissioners in the several wards of the borough of Mount Carmel, either by the Philadelphia & Reading Coal & Iron Company or by the taxing authorities of that town, we are, of course, powerless to interfere with the valuations as fixed by the board of revision.

This opinion is intended to cover in a general way all the appeals before us; specifically, the properties described

in appeal No. 337, December Term, 1907, which we hereinafter separately value.

We will take up each appeal separately and, in a short way, fix values, referring to this opinion as furnishing the reason for our action. Attached hereto will be found a schedule showing the valuations covering the entire scope of territory upon which appeals were taken, as well as the county commissioners' valuation of the balance of the coal territory, thus giving the valuations as they now stand for taxation purposes for the years 1907, 1908 and 1909.

And now, to wit: October 21, 1909, we hereby, for the purpose of taxation value the

| | |
|---|---:|
| Thomas Hamilton tract at | $326,910.00 |
| William Brady tract at | 12,084.00 |
| John Brady, including Cameron colliery and improvements | 145,315.00 |
| Luke Fidler and Galen R. Hanley tract, including colliery and washery improvements but not Luke Fidler breaker | 208,311.00 |
| William Lane tract, including Hickory Swamp breaker, etc. | 94,068.00 |
| Sarah Lane tract, including Hickory Ridge improvements in Coal township | 59,300.00 |
| William Lambert tract, including 163 acres north of mountain | 104,593.00 |
| Samuel Clark tract in Coal township | 2,405.00 |
| Daniel Reese tract at | 12,580.00 |
| John W. White tract, twelve acres at | 3,216.00 |
| Samuel Wetherill tract at | 1,240.00 |
| Luke Fidler Breaker tract at | 34,808.00 |
| Ludwig Gass & Wm. Baker at | 1,760.00 |
| Mary Lane at | 71,305.00 |

The William Brady, as we have valued it, consists of 268 acres, to wit: 181 acres valued by county commissioners at $31,200 and eighty-seven acres valued by them at $2,175.

The John Brady includes the entire tract of 628 acres more or less, the Cameron colliery and barren lands.

The William Lambert includes the 466 acres of mineral and the 163 acres north of the mountain, in all 629 acres.

We are of the opinion that the work of the coal commission and the court will enable the various assessors and the county commissioners as a board of revision hereafter to reach more just and equitable conclusions.

We wish to make a few suggestions for their guidance:

1. The township lines should be established and wherever tracts of land are partly in one and partly in another township the acreage in each township should be definitely established. Always assess to the proper township.

2. There seems to be some doubt as to the location of the line between Coal and Mount Carmel townships, and East and West Cameron townships. If nobody knows where these lines are it is high time they were established. We insist that they should by all means be established before the triennial assessment, now on, is finished.

3. In no case should a tract of land owned by the same party be divided for the purpose of assessment unless it lies partly in one township and partly in another.

4. Where a tract of land is partly underlaid with coal and partly barren it should be assessed altogether. No tract can be partly seated and partly unseated. If any portion is improved the entire tract becomes seated.

5. Breakers and improvements should be valued with the tracts of land upon which they are located, unless they are upon leased lands, in which case they should be valued separately. Where the lands have improvements owned by the same party, there is no more reason for giving them separate valuations than there would be to separately value a farm and the farm buildings, which everybody knows would not be right and is never done.

### COSTS.

We direct that the record costs of each separate appeal be paid, one-half by the county commissioners and one-

half by the appellants, except in the case of East Cameron Township Road Supervisor's Appeal, where the county is directed to pay all the record costs.

All other costs, including the fees and expenses of the coal tax commission, stenographer's bills, witness bills, and all other costs of whatever nature, shall be paid as follows:

One-half by the county of Northumberland.

One-fourth by the Philadelphia & Reading Coal & Iron Company.

One-sixth by the Mineral Railroad & Mining Company.

One-twelfth by the Lehigh Valley Coal Company.

*Errors assigned* were various rulings and exceptions, and the findings and decree of the court.

*W. H. M. Oram,* for appellant.—Where it appears that appellant's property is assessed at a higher figure than other similar properties in the township, the assessment will be reduced: Richter's App., 8 Pa. C. C. Rep. 119; Irwin Basin Coal Lands Assessment, 17 Pa. Dist. Rep. 825; Bell's App., 11 Pa. Dist. Rep. 732; Garver's Tax Assessment, 34 Pa. C. C. Rep. 138; Cambridge Spring Co.'s App., 21 Pa. C. C. Rep. 669; Pringle's App., 6 Kulp, 525; Doylestown Tax Assessment, 17 Pa. C. C. Rep. 535; Moore's App., 4 Pa. Dist. Rep. 703; Drake's App., 5 Northampton Co. 215; Weitzenkorn v. Luzerne County Commissioners, 8 Kulp, 165; Reading Iron Co.'s App., 21 Pa. C. C. Rep. 429.

This principle is carried to the extent of reducing an assessment which is already below the actual value: Dickson v. Scranton, 5 Law Times (N. S., Pa.) 179; Smith v. Forest County, 23 Pa. C. C. Rep. 643; Harrison's App., 20 Montg. 167; Rockhill Iron & Coal Co. v. Fulton County, 204 Pa. 44; Ferguson v. Lycoming County, 8 Pa. C. C. Rep. 667; Richter's App., 8 Pa. C. C. Rep. 119.

If the appraisement and settlement for taxes against a corporation for a given period are not uniform with

those made against other like corporations for the same period and do not produce uniformity, they are bad: Com. v. Lake Shore, etc., R. R. Co., 3 Dauphin, 172; Com. v. Shamokin, etc., R. R. Co., 3 Dauphin, 168; Weitzenkorn v. Luzerne County Commissioners, 8 Kulp, 165; Berwind-White Coal Mining Co. v. Clearfield County, 18 Pa. C. C. Rep. 545; Reading Iron Co.'s App., 21 Pa. C. C. Rep. 429; Logan v. Washington County, 29 Pa. 373; Becker v. R. R. Co., 177 Pa. 252.

In valuing lands for taxable purposes the market prices are all that the courts and juries can use as measures of value. All other measures are necessarily arbitrary and fanciful: Searle v. Lackawanna & Bloomsburg R. R. Co., 33 Pa. 57; Reading & Pottsville R. R. Co. v. Balthaser, 119 Pa. 472; Becker v. R. R. Co., 177 Pa. 252; Baker v. R. R. Co., 219 Pa. 398.

The act of 1889 vests in the court power to either sustain or set aside the assessment of the board of revision— to sustain if found to be correct, to set aside if found to be wrong, and the court admits the wrong: D. L. & W. R. R. Co.'s Tax Assessment (No. 1), 224 Pa. 240; Irwin Basin Coal Lands Assessment, 17 Pa. Dist. Rep. 825; Richter's App., 8 Pa. C. C. Rep. 119.

*J. W. Gillespie*, for appellee.—The decree of the court was proper: Lehigh, etc., Coal Co.'s Assessment, 225 Pa. 272; D., L. & W. R. R. Co.'s Tax Assessment, 224 Pa. 240; Searle v. R. R. Co., 33 Pa. 57; Pittsburg, etc., Ry. Co. v. Vance, 115 Pa. 325; Pittsburg, etc., R. R. Co. v. Patterson, 107 Pa. 461; Doylestown Tax Assessment, 17 Pa. C. C. Rep. 535; Reading Iron Co.'s App., 21 Pa. C. C. Rep. 429; Mattern v. Huntingdon County Commissioners, 17 Pa. Dist. Rep. 15.

The comparison is to be made with the generality of property of the same class, and not with a single assessment or a few assessments.

To the same effect is Pringle's App., 6 Kulp, 525; Armstrong County Tax Assessment, 25 Pa. C. C. Rep. 213;

Greenough v. Fulton Coal Co., 74 Pa. 486; Ins. Co. v. Yard, 17 Pa. 331; Hosack v. Crill, 18 Pa. Superior Ct. 90; Murray's Est., 216 Pa. 270; Sanderson v. City of Scranton, 105 Pa. 469; Delaware, Lackawanna & Western R. R. Co. v. Sanderson et al., 109 Pa. 583; Kingsley v. Hillside Coal & Iron Co., 144 Pa. 613; Plummer v. Hillside Coal & Iron Co., 160 Pa. 483; Lehigh, etc., Coal Co. v. Wright, 177 Pa. 387; Dorr v. Reynolds, 26 Pa. Superior Ct. 139; Bell's App., 11 Pa. Dist. Rep. 732; Hamilton Heirs' App., 14 Pa. Dist. Rep. 655; Irwin Basin Coal Lands Assessment, 17 Pa. Dist. Rep. 825.

OPINION BY MR. JUSTICE ELKIN, January 3, 1911:

This is an appeal from the decree entered by the learned court below fixing the assessed valuation of coal lands owned by appellant and located in Coal township, Northumberland county. The assignments of error are so numerous as to preclude the possibility of discussing each one separately. No useful purpose would be served by so doing. The discussion of a few controlling principles will be sufficient to properly dispose of the appeal. The case came into the court below on appeal from the valuation fixed by the board of revision. On account of the large number of appeals pending and the vast amount of details necessary to fully inform the conscience of the court, it was suggested that a commission of experts be appointed to hear the testimony, make an examination of the properties, investigate the conditions upon the ground, find the facts and report conclusions for the information of the court. This method of procedure was approved by all interested parties, three expert commissioners were appointed and the commission thus created proceeded to take testimony and make such investigation as was deemed necessary to determine the valuation of the lands in question for the purpose of taxation. The act of 1889 under which the appeals were taken does not authorize the appointment of expert commissioners for the purpose stated, but, the interested parties having

agreed to this method of procedure as an aid to the court, we can see no legal objection to the course adopted. This conclusion is based upon the assent of the parties, and even then, a commission so created can only act as a means to an end, the end being to report the facts and conclusions for the information and guidance of the court. It is the duty of the court to hear and determine the questions involved and the final responsibility must be assumed by the tribunal authorized by the statute to exercise the power conferred. If either party objects to the appointment of such a commission the court is without power to compel such a method of procedure. In the case at bar the record shows painstaking care and intelligent consideration on the part of the commission. The report is comprehensive and complete. It covers the whole field of investigation with a summary of reasons and conclusions showing painstaking consideration. It must have been most helpful to the court below as it has been here. While some items of testimony relating to assessable value may have been improperly admitted and some details of the investigation and reasons given for conclusions reached are not entirely approved, the report of the commission as a whole is commended. Of course the report of the commission can only be considered as an aid to the court and it is the action of the court upon the report that must be reviewed here.

It was agreed by the parties that the assessed value of real estate in Northumberland county was only sixty per cent of its actual value. This ratio was accepted by the court and uniformly applied in determining the valuation of each tract for assessment purposes. In other words, when the actual selling value was determined the assessed value was fixed at sixty per cent of the actual market value. This was done in compliance with the constitutional mandate requiring that all taxes shall be uniform upon the same class of subjects. It is also in conformity with the requirements of the act of 1889, and the decisions of this court construing the same: D., L. &

W. R. R. Co.'s Tax Assessment, 224 Pa. 240; Lehigh, etc., Coal Co. v. Luzerne County, 225 Pa. 267. Appellant is not therefore in position to complain that in the valuation of its lands the ratio of assessed to actual value which was generally adopted throughout the county was not used as a basis. The general average ratio agreed upon as a proper basis was applied in fixing the assessed value of each tract. It, however, is earnestly and ably argued for appellant, notwithstanding the fact that the assessed value of its lands was fixed at sixty per cent of their actual value, there still was an unjust discrimination to such an extent as to offend against the constitutional provision requiring uniformity. As this court has frequently said the purpose of requiring all tax laws to be uniform in their application to the same class of subjects is to produce equality of taxation, but absolute equality has never been attained, and approximate equality is the best result obtainable under our present system of taxation. Where there is substantial uniformity in the application of tax laws the mandate of the constitution is not offended against. This is the rule of all the cases in which the question was considered. In the case at bar appellant points to the fact that the lands of some of its neighbors, although just as valuable as those under consideration, have been assessed at a much lower valuation. For this reason it is urged that there was an unfair discrimination in the valuations to the prejudice of appellant and in disregard of the rule requiring uniformity. In some of the instances called to our attention the difference in valuation is so marked as to require explanation by the assessors who made the assessments and whose duty it was under the law to make and return a just valuation of each tract in their respective districts. But, if assessors fail to do their duty by making an assessment of some particular tract or tracts too low and the board of revision fails to equalize the valuations upon a uniform basis, the courts can only give relief in cases brought before them on appeal. It is true courts in determining the

valuation of a particular tract or tracts, from the assessment of which an appeal has been taken, must have due regard to the valuation and assessment of other real estate in the same district. But this does not mean, when on appeal the proper valuation of a particular tract of land is to be determined, the basis of uniformity depends upon a comparison with the assessed value of a few tracts that may have been assessed below the uniform standard of valuation of general application throughout the district. It is the general standard of uniformity that is the test of the rule. In the present case the general ratio of assessed to actual value throughout the county is sixty per cent and this is the uniform basis with which comparison must be made. It is the general average of assessed valuations in the entire district that most nearly approximates substantial uniformity, and substantial uniformity is the nearest approach yet made in the administration of tax laws to the requirements of the constitution. If the rule were otherwise, it is perhaps not too much to say that on appeal no tax assessment case would stand the test. It would be a rare case in which undervaluation in a few tracts could not be pointed out. It is the duty of all taxing authorities to avoid such discriminations and to insist upon a uniform basis of determining valuations for the purpose of taxation. The courts, however, can only exercise authority in the cases brought before them on appeal and have no power to revise and equalize assessments generally. On appeal it is the duty of the court, having due regard to the valuation and assessment of other real estate in the same district, to first ascertain the ratio of assessed to actual value applicable generally throughout the district, and then, when the actual value of the tract or tracts under consideration has been determined, this ratio should be applied. When this is done the result fixes the assessed valuation. This was the rule applied by the court below in the present case. Appellant complains not because it did not have the benefit of this rule but because some other tracts of land in the neighbor-

hood, the valuations of which were not appealed from, were assessed below the uniform standard. In other words, not by reason of failure to assess appellant's lands according to the uniform rule applied generally in the district, but because some tracts in the neighborhood were assessed below that standard of valuation. We agree with the learned court below that this position is not tenable. Appellant had the right to demand that its lands should be assessed according to the uniform standard of making valuations in the district, but this standard is determined by the general average of valuations and not by the assessment of a few tracts singled out for the purpose of showing undervaluation in some instances. As we view this record the valuation of the lands in question is not too high but the assessments of some other tracts called to our attention, not appealed from, are too low. This situation is beyond our control as courts can only compel a valuation of the lands under consideration to be made upon the basis of general uniformity in the district.

It is further contended that the court erred in adopting the strict measure rule of superficial areas in determining the total valuation of appellant's lands while what is known as the official acre was the basis for assessment purposes in other cases. No landowner should be required to pay taxes on more land than he owns and he should not expect to be taxed for less. Because a neighbor may be taxed for a less number of acres than he actually owns is no reason why a complaining adjoining owner should not be taxed upon the entire number of acres owned by him. The whole superficial area, no matter how large or small, is the subject of taxation. The acre is the unit of measurement and the total valuation depends upon the number of acres contained in the whole tract. There is nothing in this record to show that appellant was taxed for more acres than belongs to it. Presumably the taxing authorities accepted the acreage returned by appellant, and if so, it is not in position to

complain. We know of no rule of law, and none has been called to our attention, to sustain the position that what is called the official acre in the argument of appellant, that is, the acre and allowance as originally authorized in grants from the commonwealth, is the only acre assessable for purposes of taxation. The number of acres recited in the deed is as a rule accepted as the acreage subject to taxation. But this is not always conclusive and on survey it may overrun or fall short of the acreage called for in the deed. In either event the landowner is taxed for the actual acreage owned by him. The actual acreage as we understand the record was used as the basis for making the assessment in the present case and this was proper.

It is further contended that the percentage of increase in the valuation of real estate located in Coal township is much greater than the percentage of increase in other parts of the county and that by reason thereof unjust and excessive burdens are imposed upon appellant. This position is without merit. It might very well be that real estate in Coal township had increased in value 100 per cent while in other parts there might be no increase and in some instances actual depreciation might be shown. Uniform increase in the values of real estate throughout the entire district is not the test of uniform assessments. The assessment is uniform within the meaning of the law if the average ratio of assessed to actual market value is applied in determining the valuation of each separate tract. Some complaint is also made about the foot acre method as a basis for ascertaining the value of a tract of land for the purpose of taxation. This court has already said that this method is exceptional and, in most instances, not a proper basis to determine actual value. When the parties agree to such a method it may be used, but it is not of general application and when adopted the local conditions must be such as to give the whole coal area a present market value to be ascertained upon some definite fixed basis: Lehigh, etc., Coal Co.'s Assess-

ment, 225 Pa. 272. If in the present case the foot acre.
rule had been applied there would be ground for reversal
because the local conditions are not such as to warrant
its application and the parties did not agree upon such
a basis. But it was not applied and there is no room for
just criticism on this account. It is true there was some
testimony taken to show the quantity of coal in certain
tracts measured by foot acres but the commission ex-
pressly stated that this was only for the purpose of giv-
ing some light as to the amount of coal available for min-
ing purposes and to show the conditions existing on the
ground. It was not used as a basis of valuation and the
commission so stated in express terms. These items of
testimony were harmless because the valuations fixed
did not depend upon evidence of this character.

Again, it is argued that the valuation of each tract of
land was not based upon market value, that is to say,
the amount it would bring at public sale after due notice.
Under the circumstances surrounding the present case
there is no reversible error in this respect. There was no
evidence of sales, public or private, and hence nothing
on record to show value upon this basis. In such cases
taxing authorities must of necessity have resort to other
elements of value in order to make a proper assessment.
This question will be discussed more at length in another
appeal. Many other questions have been raised but they
are incidental to those already discussed and are not con-
trolling as the basis of determining the valuation of the
lands involved in this proceeding. Upon the whole record
we are of opinion that the evidence amply sustains the
conclusions reached by the learned court below in fixing
the valuation of appellant's lands for the purpose of tax-
ation.

Decree affirmed at cost of appellant, costs in court be-
low to be paid as there directed.