## Stevens' Appeal

*Seth T. McCormick, Jr.,* for appellants.
*Frank P. Cummings* and *Marshall R. Anspach,* for respondent.

LARRABEE, J., December 20, 1932.—Walter C. Stevens and W. Fred Stevens took this appeal from the assessment placed by the assessor for the City of Williamsport, in the year 1931, on their property situated at the northeast corner of West Fourth and Neece Streets. From this assessment the said owners first appealed to the board of revision of taxes and appeals for the city, which board refused to reduce the assessment, and from this action of the assessor and board of revision of taxes and appeals the owners took an appeal to this court under the provisions of section 2521 of The Third Class City Law of June 23, 1931, P. L. 932.

The respective owners of 31 other pieces of real estate situate on West Fourth Street and of an industrial plant situated on Susquehanna Street also appealed to this court from the assessment placed by the city assessor against their properties in the year 1931.

It was stipulated by counsel for all the parties that, with the consent of the court, the 33 appeals referred to should be tried together and that the testimony taken at the hearings in these several appeals should be considered as applying to each of the cases where the same may be relevant or material.

## Discussion

The assessment from which these appeals were taken was a triennial one made during the year 1931, and upon such assessment taxes are to be levied for the years 1932, 1933 and 1934. These assessments were begun in April 1931, under the authority of the provisions of article xv, section 4, of The Third Class City Act of June 27, 1913, P. L. 568, 615, which in substance were reënacted in section 2504 of the Act of June 23, 1931, P. L. 932, which became effective on July 1, 1931, and is designated as "The Third Class City Law", and which declares as follows:

"The assessor shall make, or cause to be made, during the year of the triennial assessment for county purposes, a full, just, equal, and impartial assessment of all property, taxable according to the laws of this Commonwealth for county purposes, and all matters and things within the city subject by law to taxation for city purposes, and a just and perfect list of all property exempt by law from taxation, with a just valuation of the same. But nothing hereinbefore contained shall be construed as making taxable for city purposes the classes of personal property which by law are made taxable exclusively for county purposes at the rate of four mills. With his assessments, he shall return such dimension, description, or quality of each lot or parcel of land as will be sufficient to identify the same, together with the number and kind of improvements. In all cases he shall value, or cause to be valued, the property at such sums as the same would, in his judgment, bring at a fair public sale thereof. It shall be the further duty of the assessor to return annually a list of all the inhabitants over twenty-one years of age."

The Act of June 23, 1931, P. L. 932, regulating appeals from tax assessments in third-class cities provides:

"Section 2521. . . . Any owner of taxable property who may feel aggrieved by the last or any future assessment or valuation of his taxable property may appeal from the decision of the board of revision of taxes and appeals to the court of common pleas of the county within which such property is situated, and, for that purpose, may present to said court, or file in the prothonotary's office, within sixty days after the board of revision of taxes and appeals have held the appeals provided for by law and acted on the said assessments and valuations, a petition signed by him, his agent, or attorney, setting forth the facts of the case. The court shall thereupon, after notice to the said board of

revision of taxes and appeals, hear the said appeal and the proofs in the case, and make such orders and decrees touching the matter complained of as to the judges of said court may seem just and equitable, having due regard to the valuation and assessment made of other property in such city. The costs of the appeal and hearing shall be apportioned or paid as the court may direct. The said appeals shall not, however, prevent the collection of the taxes complained of, but in case the same shall be reduced, then the excess shall be returned to the person or persons who shall have paid the same."

Hearings were held at various times, covering a period of several weeks, at which testimony involving assessment of each of the properties under appeal was taken. This is the first of these cases to be disposed of, and in passing upon each of these appeals the findings and conclusions of the court as to ratio of assessment to public sale value and ratio of public sale value to market value as set forth in this opinion, as well as the discussion of the principles of law applicable to the issues raised in this first case, are intended to apply with like effect to each of the other 32 cases which were heard together, as stipulated, but separate findings of fact and conclusions of law will be filed in each of these cases.

As established by the decisions of the Supreme Court, on an appeal from a tax assessment the proceedings are de novo and the introduction in evidence of the assessments of record in the city assessor's office, as revised or approved by the board of revision of taxes and appeals, makes out a prima facie case in favor of the city. However, this prima facie case remains so only until overcome by competent evidence. The Supreme Court said in The Lehigh Valley Coal Co. v. Northumberland County Comm'rs, 250 Pa. 515, 523:

"In such cases when the appeals are perfected in the Court of Common Pleas the proceedings are then de novo and the facts must be found and the law applied just the same as if the litigation was between private parties. . . . The judge who hears the case, sitting as a chancellor, is clothed with the powers of a court to hear and determine the issues involved, subject to the rules of practice and of law applicable to other hearings of an analogous character. The taxing authorities make out a prima facie case by the introduction in evidence of the assessment of record in the office of the county commissioners [this case involved a county assessment], as approved by the board of revision, together with such other books and data as may be on file relating to the valuation of the tracts of land in question. . . . This method of procedure has been recognized and approved in all of the cases in which the question has been considered and must be accepted as final and authoritative." See Pennsylvania Stave Company's Appeal, 236 Pa. 97.

The amount of the assessment appealed from in this case, made at the triennial assessment in 1931, is $24,565.

The several allegations of unfairness in the assessment, which form the basis of each of these appeals, may be briefly summarized in two charges as follows:

1. Lack of uniformity in the ratio used in making assessments, which amounts to a discrimination against appellants.

2. Excessive valuations of the properties.

It has been decided in the case of Pardee et al. v. Schuylkill County et al., 276 Pa. 246, and in Shannopin Coal Co. v. Greene County, 280 Pa. 4, that the court may hear together a number of appeals from tax assessments.

In Delaware, Lackawanna & Western R. R. Co. v. Luzerne County Comm'rs, 245 Pa. 515, 518, the Supreme Court held:

"The law requires that the valuation of real estate for the purpose of taxation shall be determined upon the basis of market value, or rather actual value,

limited and defined by market value. What the law requires cannot be disregarded no matter how desirable some method not authorized might prove to be. . . . Scientific formulas, arithmetical deductions and mental contemplations, have small value in making assessments under our practical system of taxation. The market value of the separate tracts at public sale, after due notice, is the legal basis recognized by our statutes of determining the assessable value of real estate, and until the legislature changes this method, it is binding not only upon the taxing authorities but upon the courts as well."

In Kemble's Estate, 280 Pa. 441, 444, the Supreme Court said:

"It has been statutory requirement in this Commonwealth for very many years, sustained by an unbroken line of decisions, that land must be assessed for what it would bring at a fair public sale after due notice. . . . But wherever the property has a market value, that value is the test, and the best evidence thereof is the opinions of credible witnesses familiar with such value, as in the analogous case of property taken under the right of eminent domain, in which the owner's damages are estimated by the market value of the land taken as a whole, not by the actual or estimated value of its component parts. . . .

"The intrinsic value of the property may be of assistance in weighing conflicting evidence as to market value, or, as above stated, where there is no market value, but where the latter is shown by reliable evidence, it must control and the actual value be limited thereby. In tax assessments, as elsewhere, the best evidence available must govern."

In Pennsylvania Company's Appeal, 282 Pa. 69, the Supreme Court held that "market value" means the amount of money which a purchaser, willing but not obliged to buy, would pay to an owner who was willing but not compelled to sell.

In the recent decision in the Greene County Coal Tax Appeals, 302 Pa. 179, it is declared:

"Tax assessments are not a matter of formula; they are a matter of judgment in each individual case. 'Common sense and practical everyday business experience are the best guides for those intrusted with the administration of tax laws': Harleigh Realty Co.'s Case, 299 Pa. 385, 390." See also Kaemmerling's Appeal, 282 Pa. 78.

Our appellate courts have held that the price which the land would bring at a fair sale between parties dealing on equal terms may be shown by witnesses who have knowledge of the values of property available for like use and similarly situated, and opinions based on sales of such properties may be admitted to establish the value of the land in question. Market value, within the meaning of the law, may also be shown by evidence of recent bona fide sales of the very pieces of real estate involved in the appeals: Philadelphia & Reading Coal & Iron Co. v. Northumberland County Commissioners, 229 Pa. 460. Furthermore, bona fide offers to sell at a given figure other properties of like nature and similarly situated in the neighborhood may also be shown for the purpose of establishing market values. And opinions may be received if based on the general selling price of other real estate in the community: Pennsylvania Company's Appeal, 282 Pa. 69; Hoffman v. Berwind-White Coal Mining Co., 265 Pa. 476.

The testimony discloses there were recent sales or bona fide offers made of some of the very properties involved in these appeals, as well as of other properties of like character, situated in seven of the nine city blocks comprising the section from which these appeals were taken.

The Supreme Court said in Kemble's Estate, 280 Pa. 441, 447: " . . . and where, as here, the evidence before the court as to market value is ample and all in conflict with the board's valuation, the court, in the absence of other

such evidence, must revalue the property according to the market value established."

It was stipulated by the parties that where sales have been made of any property involved in these appeals, in the year 1931 or prior thereto and not earlier than 1929, such sale price shall be recognized as fixing the market value of the property. This stipulation also applies where a bona fide offer to sell any of the properties involved had been made by the owner within the same period of time. It was also stipulated by the parties that the fair public sale value of property in the City of Williamsport is less than the negotiated or private sale value, or so-called market value; also where the term "fair market value" is used in the testimony it is to be understood as the value established by private or negotiated sales, as distinguished from what is generally understood and referred to as public sale value.

On the question of what ratio of assessed to public sale value was adopted by the city assessor and the board of revision of taxes and appeals in making assessments in the year 1931, Herbert T. Ames, who was mayor of Williamsport from 1928 to 1931, inclusive, and by virtue of said office also a member of the board of revision of taxes and appeals during the year 1931, testified that the basis for making assessments throughout the city was from 70 percent of the actual value of the property "down to a less amount". George R. Fleming, a member of city council from 1924 to 1931 inclusive, and by virtue of such office also a member of the board of revision of taxes and appeals during that period, testified that the ratio of assessed valuation was "up to 70 percent of their fair public sale value." John E. D. Huffman, one of the appellants, testified that shortly after taking his appeal he was told by the city assessor that the basis used in making assessments was about 70 percent of the actual value, and that later when this same witness appeared before the board of revision of taxes and appeals one of the members, in the presence of the entire board, stated that the basis used for assessing property was about 70 percent of the actual value. Another witness, W. B. Stuart, testified that S. J. Webster, city assessor, told him that the ratio of assessed value to public sale value was 70 percent. This statement had been previously denied by the assessor who testified that he did not use the ratio of 70 percent of the real value in making assessments. Another witness, W. C. McCormick, stated that the city assessor had told him this ratio was 70 percent of fair public sale value.

The witnesses F. B. Wetzel and B. E. Richards, in behalf of appellants, testified they had had several years' experience in the real estate business in Williamsport and had actual knowledge of a large number of sales throughout the city, and that in their opinion the ratio of assessed valuation was about 70 percent of public sale value.

The witnesses Fred W. Tepel and Mark C. Krause, whose knowledge of actual sales of real estate in the City of Williamsport and general experience in real estate matters made them the most thoroughly qualified of those produced in behalf of the city, did not give any testimony as to the ratio of assessed value to either market value or public sale value.

Among the witnesses for appellants were three real estate men, Jesse S. Bell, W. C. McCormick and L. W. Bluemle, who had collected a large amount of data pertaining to values and assessments in Williamsport in preparation for the hearing of these appeals and who admitted that their compensation for these services was contingent upon the amount of reduction in taxes, if any, to appellants that might result upon the determination of the relative merits of these appeals. Therefore, in weighing their testimony, the court takes into consideration the interest these three witnesses may have in the result of these

appeals. The court finds that the witness, L. W. Bluemle, is also an appellant in one of these cases as owner of one of the properties involved.

In corroboration of the foregoing testimony as to the ratio of assessed value to public sale value adopted generally throughout the city, the three witnesses, Bell, McCormick and Bluemle, testified that this ratio is about 70 percent.

The court finds from the weight of the evidence the ratio used by the city assessor and board of revision of taxes and appeals in assessing properties generally throughout the City of Williamsport in the year 1931 to be 70 percent of their public sale value.

In fixing the public sale value as a basis for assessment, as required by the statute, it is necessary to establish such value in many cases from the figures testified to as forming market value, which latter is sometimes designated in the testimony as negotiated or private sale value. It was stipulated by counsel that the fair public sale value of property in the City of Williamsport "is of lesser amount" than the so-called market value or private sale value. Fred W. Tepel, a witness produced in behalf of the city, testified that public sales bring from 5 to 15 percent less than private or negotiated sales. T. P. Reitmeyer, a former city assessor, testifying in behalf of respondent, stated that public sale values might be from 15 to 20 percent below the market values; and another witness for the city, Warren B. Wagner, gave as his opinion that public sale value is about 20 percent under private sale value or market value. S. J. Webster, city assessor, testified that, with some exceptions, public sale value is less than so-called market value. M. C. Krause, in behalf of the city, testified that prices derived from either public or private sales are approximately the same, that "they would very nearly approach each other". The testimony of B. E. Richards and F. B. Wetzel, in behalf of the appellants, is that public sale value is 70 percent of private sale or market value. Jesse S. Bell, W. C. McCormick and L. W. Bluemle, testified that the public sale value of real estate in the City of Williamsport was about 70 percent of the so-called market value or negotiated sale value.

None of the other witnesses who testified in behalf of the city gave any definite testimony as to this ratio of public sale value to so-called market value.

The court is of the opinion, and so finds from the weight of the evidence, that the public sale value of real estate generally in the City of Williamsport in the year 1931 was 80 percent of its so-called market value or negotiated private sale value.

The 33 properties involved in these appeals are, with one exception, all situated on West Fourth Street at various points within the limits of nine adjoining city blocks extending from Hepburn Street westwardly to Grier Street.

Several witnesses for the appellants testified that this part of West Fourth Street was, for many years, one of the leading residential sections of Williamsport, containing the homes of many of its wealthy citizens. Erected in the flourishing days when lumber was king in the West Branch Valley, these residences were among the finest in the city, substantially constructed of the best materials and representing most desirable types of architecture. About 15 years ago conditions began to change and in the erection of modern, expensive residences the trend has been decidedly towards the outlying districts of the city, known as Grampian, Vallamont and Faxon. As a consequence there has been a marked decline in the demand for residences along West Fourth Street, with a resulting decrease in their salable value. It was also testified that one of the prevailing characteristics of these homes is that they have very high ceilings and require a larger amount of fuel to heat them than the more modern type of homes. Many of them were built from 30 to 50 years ago and repairs

are required more frequently than on residences constructed in recent years, and these items of expense also affect the salability of these properties. Two witnesses for the city, Mark C. Krause and Fred W. Tepel, stated that West Fourth Street was one of the older residential sections of the city, that most of the homes there were 30 years of age or more, and the witness Tepel stated the more desirable residential sections were now in the outlying districts.

The court finds that some of the witnesses produced in behalf of the city did not meet the qualifications indicated in the decisions of our Supreme Court as necessary for fixing market values and public sale values of real estate. Instead of basing their opinions on knowledge of actual sales of real estate in the section involved in these appeals or of bona fide offers at which similar properties there were held, they admitted their opinions were formed from such considerations as cost of replacement of improvements, or that the style of architecture made a special appeal to them. Some admitted they were influenced in their estimates from the amounts of mortgages placed some years ago on the properties, and others relied on the figures of assessments already placed on the properties. Five of the witnesses for the city admitted that in nearly every instance they had fixed the land values from a chart or formula of foot-front values that had been devised by the city assessor's office several years ago rather than from their individual knowledge of present land values. Some of these witnesses frankly admitted that they gave no consideration to actual sales of property or bona fide offers of property in this section of the city. Others testified that if they had known that certain properties of like nature and use in that district had been sold or recently offered for sale at a definite figure that would have little or no influence with them in valuing the properties in question. For these reasons, the court finds that the qualifications of some of the respondent's witnesses were very meagre and not sufficient to render their testimony competent on many of the properties involved; all this, notwithstanding the well-established ruling laid down by the Supreme Court of Pennsylvania that knowledge of recent actual sales of the very properties involved or sales of property of like nature and use in the neighborhood, as well as bona fide offers at which such properties were held by the owners, constitutes the best evidence upon which to base values for assessment purposes, and that charts, scientific formulas, and arithmetical deductions have small value in making assessments under our practical system of taxation. Public sale value of separate tracts of land sold, after due notice given, is the legal basis recognized in determining the assessable value of real estate.

The Supreme Court has declared:

" 'If, however, there have been no recent sales of the lands under consideration, or of other lands of like quality similarly situated, or no general asking or selling price in the neighborhood is shown, an assessor must of necessity use his best judgment in determining what he believes the land would sell for at a bona fide sale after due notice. . . . [In such case] the market value may be established by the testimony of persons acquainted with the property, and whose knowledge and experience qualify them to form an intelligent judgment as to its proper valuation': P. & R. Coal & Iron Co. v. Northumberland County Com'rs, 229 Pa. 460, 466, 467." See Pennsylvania Company's Appeal, 282 Pa. 69, 75.

Proper methods for valuation of real estate for assessment purposes could, in most instances, be readily adopted by a careful observance of the guiding principles established by our appellate courts. Once a proper basis to estimate from is established by considering the figures of recent sales or bona fide offers of similar properties in the vicinity, other factors may then be per-

mitted to enter into consideration. Among these may be mentioned the relative dimensions of the land to be assessed, its location and accessibility for general use, the nature of its surroundings, and any other desirable residential or commercial features and elements of value that would influence the mind of a purchaser; also the nature and quality of construction of the improvements, and the age, condition, size, and convenient arrangement of the structures and whether their appointments are modern or obsolete. In determining the statutory requisite of fair public sale value, however, these features should always be considered in connection with the prices at which similar real estate has sold in the locality, wherever it is possible to obtain knowledge of recent sales.

On the subject of uniformity of assessment, the requirement of our State Constitution, as set forth in article IX, section 1, that "all taxes shall be uniform, upon the same class of subjects," should be one of the chief aims of the assessing authorities. However, it is quite apparent that absolute uniformity is practically impossible of attainment owing to the nature of the various factors that enter into the making of assessments.

On this question our Supreme Court said in Delaware, Lackawanna & Western Railroad Company's Tax Assessment (No. 1), 224 Pa. 240, 243:

"While every tax is a burden, it is more cheerfully borne when the citizen feels that he is only required to bear his proportionate share of that burden measured by the value of his property to that of his neighbor. This is not an idle thought in the mind of the taxpayer, nor is it a mere speculative theory advocated by learned writers on the subject, but it is a fundamental principle written into the constitutions and statutes of almost every state in this country. In Pennsylvania the framers of the new constitution embodied this principle in our organic law in terms so plain that no one should misunderstand its meaning or doubt its application, and the people by the adoption of that instrument placed the seal of their approval upon a system of taxation which has for its corner stone uniformity in the valuation, levy and collection of all taxes. . . . The central thought running through all the opinions is that the principle of uniformity is a constitutional mandate to the courts, to the legislature, and to the taxing authorities, in the levy and assessment of taxes which cannot be disregarded. The purpose of requiring all tax laws to be uniform is to produce equality of taxation."

Again in this same decision, the court said:

"Absolute equality is difficult of attainment, and approximate equality is all that can reasonably be expected. Hence it has been held that where there is substantial uniformity the constitutional requirement has been met . . . But all these cases hold there must be substantial uniformity which means as nearly uniform as practicable in view of the instrumentalities with which and subjects upon which tax laws operate. It is the duty of the courts in dealing with this subject to enforce as nearly as may be equality of burden and uniformity of method in determining what share of the burden each taxable subject must bear. . . . "

For the purpose of showing a lack of uniformity in the making of the assessments appealed from, as compared with the assessments on other residential properties in various parts of the city, the appellants produced a list of 25 recent sales of property in different parts of the city exclusive of West Fourth Street, obtained from the reports of real estate sales made by the city engineer to the city assessor and showing that the average ratio of assessments to the fair public sales value as made by the city assessor in 1931 for the year 1932 was about 70 percent. The appellants also produced a list of 98 residential properties, chosen at random from several sections of the city, exclusive

of West Fourth Street, with a record of their actual sales, and these showed the same ratio of assessment to public sale value of approximately 70 percent. The 123 properties contained in these two lists are distributed among 13 of the 16 wards of the city, and it was shown they were representative of similar properties throughout Williamsport and that the average ratio of assessment to fair public sale value, applied to them by the city assessor in 1931, was about 70 percent. The city contended that this comparatively limited number was not representative of the assessments levied generally over the city. However, the court is convinced that this evidence forms some substantial corroboration of the testimony of ex-Mayor Ames, ex-Councilman George R. Fleming, and other witnesses, that the ratio of assessment to public sale value applied generally throughout the City of Williamsport for the year 1931 was 70 percent. The respondent also contends it would be necessary, in order to prove a lack of uniformity of assessment in the cases appealed from as compared with assessments elsewhere throughout the city, for appellants to show assessments of a much larger number of properties and covering each of the 16 wards. It appears that all assessments for city purposes were made by the same assessor and we fail to see any merit in a proposal that requires arbitrary ward limits to be drawn in order to show uniformity of rate elsewhere in the city. If there were separate assessors for each ward it might lend more force to respondent's argument. The court is not persuaded that such a requirement should be met and cites in support of his conclusion the opinion of the Supreme Court in the recent decision in Harleigh Realty Company's Case, 299 Pa. 385, where, in passing on a similar question, it was said (p. 389):

"If this procedure were to be adopted, each property owner appealing would have to revalue every other property in the district. To put upon a property owner challenging an assessment such a burdensome and expensive method of asserting his rights would amount to a denial of justice." In the same case it was also said (p. 388):

"The contention of the city is that the property owner failed to show that the assessment as originally made exceeded the fair market value of its property or was not uniform with the assessments of other properties throughout the city. When a property owner shows, as was shown here, that assessments throughout the taxing district were made upon the basis of 60 per cent of market value and what the market value of his property is, and that the assessment, if based on such value, exceeds the established percentage, he has made out a case entitling him to relief."

Furthermore, the court finds that no testimony was offered by the city to rebut this evidence of the appellants on the ratio of assessments to public sale value applied elsewhere throughout the city.

The court is convinced, from a careful consideration of the evidence, that the ratio applied generally by the assessing officials in making assessments elsewhere throughout the City of Wililamsport on properties of like nature and use as those involved in these appeals, in the year 1931, was 70 percent of their fair public sale value.

However, in making these assessments, from which appeals were taken, it was clearly shown that the percentage applied to each of them was much in excess of 70 percent of the public sale value. In fact in many of the cases appealed the amount of the assessment equaled, and in some cases even exceeded, the fair public sale value of the property.

The statute which regulates the manner of making these assessments declares that property shall be assessed at its "fair public sale value." However, our Supreme Court has established the guiding principle that where in any given

municipality a lower rate than that of actual public sale value is used generally for assessment purposes such ratio or percentage so adopted must be applied uniformly throughout the taxing district on the same class of property: that each property owner must be treated on the same basis throughout the city. It is plainly evident that this ruling was not observed in making these assessments appealed from. See Mineral R. R. & Mining Co. v. Northumberland County Comm'rs (No. 1), 229 Pa. 436.

It was held in the case In re Assessment of Irwin Basin Coal Lands, 17 Dist. R. 825, 828, that:

"If the rule generally applied, instead of being 100 per cent. of the actual value of the taxable property, as the law requires, is in fact only 50 or 75 per cent. of such actual value, it would become the duty of the court to bring the appellant's assessment into conformity with the actual . . . rule generally applied. . . . The court, on an appeal, may be compelled to apply another than the statutory mode of valuation as the only available way left of bringing about that fundamental right of uniformity which the Constitution secures. The court has not been invested with power to raise an assessment made by the assessors or by the board of revision at a valuation beneath its actual value, but has only been invested with the power to correct inequalities in this respect by lowering the appellant's assessment so that it will conform to the rule actually applied by assessors and revisers, whether that lower standard is the one expressly authorized by law or not."

See, also, Doylestown Tax Assessments, 17 Pa. C. C. 535, 536, 538, and Penn National Bank and Trust Company's Assessment, 23 Berks Co. L. J. 372.

For the purpose of correcting the inequalities in the assessments appealed from, the court will revalue each of these 33 properties in the light of the evidence and find their fair public sale value, and then proceed to reassess them by applying the ratio of 70 percent of their fair public sale value, which, it was shown, is the percentage generally applied in assessing similar properties located elsewhere throughout the city, with the exception of the J. H. McCormick Company's industrial plant to which a lower ratio, to wit, 50 percent, will be applied.

In fixing the value of the real estate in question the court is not obliged to adopt the same figures or estimates as given by either of the parties, but may fix its own valuation based upon the evidence before it: Phila. & Reading Coal & Iron Co. v. Northumberland County Comm'rs, 229 Pa. 460, Reading Coal & Iron Company's Assessment, 290 Pa. 187, and The Lehigh Valley Coal Co. v. Northumberland County Assessors, 250 Pa. 515. In the recent decision in Harleigh Realty Company's Case, 299 Pa. 385, 388, a case involving like questions, the Supreme Court said:

"When the court, reviewing the action of the taxing authorities, came to formulate its judgment, it did so in the usual, customary and proper way, from a consideration of evidence as to the actual value of the property, and applied to its conclusion of what that value was, the percentage which the assessing officials had applied throughout the city. . . ."

The piece of real estate involved in this appeal has a frontage on West Fourth Street of 50 feet and a depth of 104 feet along Neece Street, upon which there is erected a three-story brick store building.

This property was assessed by the city assessor in the year 1931, for taxes for the year 1932, at the sum of $24,565.

It was stipulated by counsel for all the parties that where a sale had been made of any property involved in these appeals in the year 1931 or prior thereto and not earlier than 1929, said sale price shall be recognized as fixing the market value of the property and no testimony would be offered on the part of the

respondent affecting such figures. This also applies in cases where a bona fide offer of the sale of property has been made by the owner within the same period of time.

It was shown by the testimony that the real estate involved in this particular appeal was purchased by the appellants, Walter C. Stevens and W. Fred Stevens, on August 15, 1931, at a private sale, for the sum of $20,000.

In view of the foregoing stipulation the court finds that the fair market value of this property in the year 1931 was $20,000, and for the purpose of obtaining the fair public sale value, as the basis required for assessment under the statute, the court applies the ratio of fair public sale value to the fair market value, which it found from all the evidence to be 80 percent.

### Findings of fact

1. The court finds that the fair public sale value of the property of the appellants at the time the assessment complained of was made, in the summer of 1931, was $16,000.

2. The court finds that the ratio of assessment to fair public sale value in the City of Williamsport in the year 1931 for real estate of like nature to that involved in this appeal is 70 percent.

### Conclusions of law

1. The court concludes that the said assessment of $24,565 placed on the property of the appellants is excessive and unjust.

2. For the purpose of correcting this inequality and having the taxes levied against it made uniform with the rate levied on other real estate in the city, the court concludes that the assessment of the said property of the appellants should be reduced from $24,565 to $11,200.

### Order and decree

And now, to wit, December 20, 1932, the prothonotary is directed, in accordance with the foregoing decision, to enter a decree nisi, and to give notice of the same to the parties in interest or their counsel of record forthwith, and if no exceptions are filed within 10 days thereafter, counsel for either of the parties may present to the court a form of final decree to be entered in the matter.

NOTE.—The court found that in each of the 33 cases appealed and tried together the assessment was unfair and excessive and made a reduction in each of the assessments. The total amount of these reductions made by the court is $240,000. Separate findings of fact and decrees were entered in each of the other appeals. Exceptions to the foregoing decree nisi were dismissed by the court on March 31, 1933.

From Harry Alvan Baird, Williamsport, Pa.